**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 08-20147-JWL** |
| ) | |
| **BRIAN C. FIX,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| _____) | |

**MEMORANDUM AND ORDER**

Defendant Brian C. Fix was charged by indictment with four counts on October 9, 2008, including: 1) felon in possession of firearms, 2) possession with intent to distribute methamphetamine, 3) possession of firearms in relation to a drug trafficking crime, and 4) possession of an unregistered firearm.  (Indictment, Doc. 1, at Counts 1-4). The matter before the court is Mr. Fix's Motion to Suppress Evidence.  (Doc. 14).  Mr. Fix does not challenge the validity of the initial law enforcement contact; however, he does challenge his continued detention by Deputy Daniel Fretz and the eventual search of his truck by Deputy Valdez.  Mr. Fix argues that his continued detention violated his rights under the Fourth Amendment because Deputy Fretz's initial suspicion had been dispelled, and therefore, the detention unconstitutionally exceeded the scope of the initial stop.  In addition, Mr. Fix argues that he did not give voluntary, valid consent to Deputy Jesse Valdez II to look for his passenger's identification.  The court held an evidentiary

hearing on this motion on December 29, 2008, and took the matter under advisement. After thoroughly considering the parties' arguments and the evidence, for the reasons set forth below, the court denies the motion.

## FINDINGS OF FACT

On September 4, 2008 at approximately 12:22 a.m., Deputy Fretz of the Johnson County Sheriff's Department observed a truck parked in front of a closed business at 4839 Merriam Drive.  While driving past the truck in his patrol car, Deputy Fretz saw three white males standing outside on the passenger's side of the truck.   According to Deputy Fretz, the truck had its headlights on, but the hood was down, and when he drove by, the three males "started to scatter or spread out" and "move away from the vehicle." At this point, Deputy Fretz turned around and activated his emergency equipment to "investigate what was going on."

After turning his patrol vehicle around, Deputy Fretz pulled into the parking lot behind the truck.  Two of the three males, eventually identified as the driver-defendant, Mr. Fix, and the passenger, Mr. Bailey, got inside the truck as Deputy Fretz turned on his emergency lights, and the third unidentified person "picked up his pace to a brisk walk [and] got inside his vehicle which was parked against the fence of the business." According to Deputy Fretz, this third unidentified male "got into his car and took off" before he was able to let dispatch know his location.   At this point, Deputy Fretz notified dispatch via radio that he was conducting an "occupied vehicle check" and informed them that a second vehicle–a tan compact possibly with Kansas tags–fled the

scene.

After advising dispatch of the situation, Deputy Fretz approached the truck on the driver's side and asked the driver and passenger for their identification. The driver, Mr. Fix, gave Deputy Fretz his license; however, the passenger, Mr. Bailey, told Deputy Fretz that he did not have any identification as he had left his wallet at home.[1] Deputy Fretz then asked the passenger to provide his name and date of birth orally. Deputy Fretz also inquired what they were doing in the parking lot. Mr. Fix explained that his vehicle broke down, he needed a jump start, and the man who left the scene had stopped to give him a jump start.[2]

Upon receiving oral identification from Mr. Bailey and a driver's license from Mr. Fix, Deputy Fretz returned to his patrol car and ran both men's information through dispatch. At some point in this process, Officer Reynolds of the Merriam Police Department arrived as back-up for Deputy Fretz.[3] Dispatch advised Deputy Fretz that

---

[1]Deputy Fretz testified that Mr. Bailey "appeared to be under the influence of drugs" because Mr. Bailey's arms were flailing about, he was sweating profusely, and he was unable to sit still as his legs and head were moving back and forth.

[2]Deputy Fretz stated during the evidentiary hearing that this explanation did not "add up in [his] head" because of the distance between the two vehicles (too long for jumper cables), the fact that the two cars were not positioned in a manner consistent with someone getting a jump start, and the fact that the hoods of both vehicles were down when Deputy Fretz first saw them.

[3]Officer Reynolds, as a back-up officer, gave Deputy Fretz an additional set of eyes on the scene; however, he did not have any interaction with Mr. Fix and Mr. Bailey.

Mr. Fix was on parole for possession of methamphetamine,[4] and in the computer, there was a request to complete a field interview form ("FIF").[5]

At this time, Deputy Fretz returned to the truck and asked Mr. Fix to exit the vehicle. Deputy Fretz then obtained the necessary information to complete the FIF on Mr. Fix, copying down the information from his Kansas driver's license, verifying the information, and gathering the other necessary information, such as place of employment and phone numbers.[6] Once Deputy Fretz obtained the information from Mr. Fix, Mr. Fix returned to his truck and Deputy Fretz asked Mr. Bailey to step out of the vehicle to get the necessary information to complete the "associates" portion of the FIF. About the time Deputy Fretz asked Mr. Bailey to step out of the vehicle, approximately 12:40 a.m., Deputy Valdez and Deputy Burns of the Johnson County Sheriff's Office arrived on the

––––––––––––––––––––

[4]At the evidentiary hearing, Deputy Fretz could not recall whether Mr. Fix had notified him that he was on parole when he first approached the vehicle and asked for his identification.

[5]According to Deputy Fretz, a request to complete a FIF is listed in the computer by probation or parole officers or other agencies when people are on parole. If a parolee has police contact, he is supposed to report it to his parole officer. An officer completes a FIF to forward to the probation or parole officer detailing what happened during the police contact. A FIF includes the parolee's personal information–name, date of birth, address, social security number, work address, home phone number, and work phone number. It also has space for vehicle information, if he is in a vehicle at the time of the police contact, clothing description, and any people he is with at the time of the contact. A FIF requires some personal information about the associates of the parolee, although not as extensive as for the parolee himself.

[6]Deputy Fretz gathered this information from Mr. Fix near the rear of the truck in front of Deputy Fretz's patrol vehicle.

4

scene.

Deputy Valdez approached Deputy Fretz, and Deputy Fretz explained briefly that he was gathering information for a FIF, and then Deputy Fretz continued in obtaining information from Mr. Bailey.  Deputy Fretz verified that Mr. Bailey did not have any identification with him, and Mr. Bailey confirmed that he did not.[7]

Deputy Valdez overheard Mr. Bailey state that he did not have identification on him.  At this point, Deputy Valdez approached the truck on the passenger's side and knocked on the window.[8]  In response, Mr. Fix looked over at Deputy Valdez.  Deputy Valdez then opened the passenger's door and asked Mr. Fix, who was currently seated in the driver's seat of the truck, if Mr. Bailey's identification was in the truck.  Mr. Fix replied that he did not think it was.  Deputy Valdez then asked Mr. Fix if he could look where Mr. Bailey had been sitting in the passenger's seat for Mr. Bailey's wallet or identification.  Mr. Fix agreed to let Deputy Valdez search the passenger's seat for Mr. Bailey's identification.

First, Deputy Valdez picked up a black stocking cap from the seat, looked inside,

---

[7]During this interaction, Mr. Bailey continued to fidget, and Deputy Fretz noted that Mr. Bailey had "track marks"—small sores along his veins that are caused by injecting drugs—up and down both of his arms.

[8]Deputy Valdez testified that in his experience when he stops an individual who claims not to have identification on him it is frequently because he has an outstanding warrant or has a suspended license and he will try and give false information to avoid further investigation.  However, Deputy Valdez explained that many times he would find the identification stuffed underneath the seats, under a floor mat or in a glove box.  Therefore, when Deputy Valdez heard Mr. Bailey say he did not have identification on him, Deputy Valdez thought it might be in the truck.

and finding no identification, placed it back on the seat.  Next, Mr. Fix picked up a small box or computer from the middle console/armrest as if he was helping Deputy Valdez look for Mr. Bailey's identification.  Then Deputy Valdez noticed an open Marlboro cigarette carton box and looked inside for Mr. Bailey's identification or wallet.  At this time, a soda box fell from the hump between the driver's and passenger's seats onto the passenger's front floorboard and a little derringer immediately fell out of the box onto the floor.

Deputy Valdez then told Mr. Fix to keep his hands on the wheel, and yelled to Deputy Fretz that he had found a gun.  Deputy Burns approached the truck on the driver's side and took control of Mr. Fix.  Deputy Burns took Mr. Fix to the rear of the truck, patted him down, and handcuffed him.  Deputy Valdez walked back toward Deputy Fretz, handcuffed Mr. Bailey, and placed him in the back of his patrol car. While in the patrol car, Deputy Valdez informed Mr. Bailey that he was not currently under arrest, but that he needed to know who owned the derringer and if there were any more weapons in the truck. Mr. Bailey informed Deputy Valdez that the derringer was Mr. Fix's, that he feared for his life and his family's safety, that they had been driving around Johnson County that night making a few drug transactions, and that there was still methamphetamine in a black nylon camera bag in the tool box in the bed of the truck.  At this point, the police proceeded to search the truck.

## LEGAL ANALYSIS

"The Fourth Amendment protects the right of the people to be secure in their

6

persons, houses, papers, and effects, against unreasonable searches and seizures."

*United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005).

> "The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular invasion of a citizen's personal security. Reasonableness, of course, depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."

*United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (reh'g en banc) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977)). "Its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

There is no question that "[a] traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *Bradford*, 423 F.3d at 1156 (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).[9] There is also no question that Deputy Fretz seized Mr. Fix when he pulled behind the truck with his emergency equipment activated and questioned him about his reasons for being in the closed business's parking lot at that time of night. However, Mr. Fix does not argue that Deputy Fretz acted unconstitutionally with respect to the initial police contact. Therefore, Mr. Fix concedes the first question under a *Terry* analysis, namely, "the stop was justified at its inception." Instead, Mr. Fix argues that

---

[9]Here, although in Deputy Fretz's police report it is described as a traffic stop, the police contact might be better characterized as simply a *Terry* stop. Regardless of its characterization, the two-step inquiry is the same.

Deputy Fretz acted unconstitutionally with respect to the second question: "whether the officer's conduct during detention was reasonably related in scope to the circumstances which justified the initial stop." *Williams*, 403 F.3d at 1206 (citing *Terry*, 392 U.S. at 20). Police officers may stop and briefly detain someone for investigatory reasons if the officer has a reasonable suspicion that criminal activity may be taking place. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Once the officer resolves the concern that justified the initial stop, any continued detention must be supported by a reasonable suspicion of criminal activity. *United States v. Alarcon-Gonzalez*, 73 F.3d 289, 292 (10th Cir. 1996). Mr. Fix argues that Deputy Fretz's initial suspicion was dispelled by Mr. Fix's explanation of receiving a jump-start from a "good Samaritan," and consequently, Deputy Fretz had no reason to continue to detain him.

The court disagrees with Mr. Fix that Deputy Fretz did not have reasonable suspicion to continue to detain him. In assessing whether reasonable suspicion exists to support an investigative detention, the court examines the totality of the circumstances, as viewed by an objectively reasonable police officer while granting deference to the officer's training and experience, to determine whether a particularized and objective basis existed for suspecting illegal activity. *United States v. Lopez*, 518 F.3d 790, 797 (10th Cir. 2008). This standard "requires an officer to have 'some minimal level of objective justification,' but he or she 'need not rule out the possibility of innocent conduct as long as the totality of the circumstances suffices to form a particularized and objective basis for [an investigative] stop.'" *United States v. Cortez-Galaviz*, 495 F.3d

1203, 1206 (10th Cir. 2007) (quoting *I.N.S. v. Delgado*, 466 U.S. 210, 217 (1984) and *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004)); *see also United States v. Olivares-Campos*, 276 Fed. App'x 816, 820-21 (10th Cir. 2008).  Therefore, the reasonable suspicion requirement is "obviously less demanding than that for probable cause." *Sokolow*, 490 U.S. at 7.

As Deputy Fretz repeatedly explained during the evidentiary hearing, he initiated contact with Mr. Fix and Mr. Bailey because he suspected possible criminal activity upon observing a vehicle with its headlights on in the parking lot of a closed tow lot at that late hour of night while three males stood outside.  His suspicion continued when the men scattered in reaction to his turning around and turning on his emergency equipment.  Then upon hearing Mr. Fix's explanation of their presence in the tow lot, Deputy Fretz was unconvinced as the cars appeared to be positioned incorrectly to be there for the reason Mr. Fix stated, namely, to get a jump start.  In addition, the cars appeared too far apart for jumper cables to reach and the hoods of both cars were down when Deputy Fretz drove by.  Deputy Fretz also observed Mr. Bailey's erratic behavior and noted that he appeared to be under the influence of drugs.  This suspicion was corroborated by Deputy Fretz's observation that Mr. Bailey had track marks on both of his arms.  Deputy Fretz was also concerned about the time of night and the fact that there was not a representative of the tow company present.  Given all of these observations, the court does not doubt that Deputy Fretz had reasonable suspicion to continue his investigatory detention of Mr. Bailey and

Mr. Fix.

Having determined that Mr. Fix's continued detention was lawful, the remaining question before the court concerns Deputy Valdez's discovery of the derringer pistol while searching for Mr. Bailey's identification. In his initial motion to suppress, Mr. Fix focused on arguing that because his continued detention was unlawful, Deputy Valdez could not obtain valid consent to search for Mr. Bailey's identification. At the evidentiary hearing, Mr. Fix focused on whether he could give valid consent given Deputy Valdez's actions and the totality of the circumstances surrounding his interaction with the police. Even if his detention was lawful, Mr. Fix argues that his consent to search was nevertheless invalid because it was the product of unlawful coercion—i.e., his consent was not voluntary. In assessing this argument, the court must consider "whether a reasonable person would believe he or she was free to leave or disregard the officer's request under a totality of the circumstances." *United States v. Cardenas-Alatorre*, 485 F.3d 1111, 1118 (10th Cir. 2007) (quotations omitted).[10] The Tenth Circuit has repeatedly explained that "[a]lthough the fact that one is detained during an investigation no doubt implies an atmosphere not altogether consensual, our precedent firmly instructs us that the fact of an investigative detention, standing alone, is not so coercive as to render the consent of all detained persons involuntary." *Olivares-Campos*,

---

[10] As the Tenth Circuit explained in *United States v. Thompson*, 546 F.3d 1223, 1226 n.1 (10th Cir. 2008), "[i]t might bring greater clarity to this area of the law if the test were framed in terms of whether the officer's behavior is coercive rather than whether, under the circumstances, the reasonable person would feel 'free to disregard the police,' which we suspect is unrealistic."

276 Fed. App'x at 824 (citing *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) ("A person who is being detained may still give a voluntary consent."); *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993) ("Valid consent may be given by a person being detained.")).

Rather, detention is only one factor to consider in determining whether the totality of the circumstances would have communicated to a reasonable person that he or she was not free to decline a request to search. *See United States v. Contreras*, 506 F.3d 1031, 1037 (10th Cir. 2007). As the Tenth Circuit explained in *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996):

> Courts have identified several factors that could lead a reasonable innocent person to believe he is not free to disregard the police officer, including: the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects . . . ; a request to accompany the officer to the station; interaction in a nonpublic place or small, enclosed space; and absence of other members of the public."

In *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005), the Tenth Circuit expanded on the list of factors relevant to the consent inquiry, including:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised the defendant at any time that he had the right to terminate the encounter or refuse consent.

The court has made clear that this list of factors is not exhaustive and "no one factor is

11

dispositive." *United States v. Abdenbi*, 361 F.3d 1282, 1291 (10th Cir. 2004). Here, an examination of these factors reveals that Mr. Fix could have reasonably believed he was free to decline Deputy Valdez's request to search the passenger's seat for Mr. Bailey's license. After all, none of the classic signs of consent unlawfully coerced exist in this record—no threats, brandishing of weapons, aggressive language, or the like. While it is true that there were multiple officers and patrol cars on the scene, Mr. Fix only interacted with two of the officers—Deputy Fretz, who initially detained Mr. Fix and gathered the information for the FIF, and Deputy Valdez, who requested permission to search for Mr. Bailey's identification in the passenger's seat of the truck. Neither of these officers brandished his weapon or physically touched either Mr. Fix or Mr. Bailey, nor did either use an aggressive tone. If Deputy Fretz or Deputy Valdez had engaged in these sorts of actions, it might have suggested a lack of consent. *See United States v. Drayton*, 536 U.S. 194, 204-05 (2002) (noting the coercive nature of actively brandishing a weapon). That these officers did not do so, however, suggests that the encounter was consensual. *See id.* at 204; *see also United States v. Ringold*, 335 F.3d 1168, 1172 (10th Cir. 2003). Importantly under case law, neither officer used an antagonistic tone in asking their questions. *See United States v. Little*, 60 F.3d 708, 712 (10th Cir. 1995) (discussing the coercive effect of "accusatory, persistent, and intrusive" questioning). It is true that all of the officers present were uniformed, and in the past, the Tenth Circuit has held that this could serve as an intimidating factor. *See Spence*, 397 F.3d at 1283. However, the Supreme Court has since cast doubt on this factor

12

bearing much weight in the analysis.  *See Drayton*, 536 U.S. at 204 (discussing how an officer in uniform or visibly armed "should have little weight in the analysis"). As the Tenth Circuit explained in *Thompson*, "[i]t is possible that reasonable persons have, or should have, greater confidence in the professionalism and good will of uniformed officers than of persons asserting authority who are not in uniform." 546 F.3d at 1228. Mr. Fix would like the court to believe that because Deputy Valdez opened the passenger door of the truck rather than waiting for Mr. Fix to roll down the window or reach across the truck to open the door, his consent to search the passenger's seat was involuntary. The court declines this invitation and finds given the totality of the circumstances Mr. Fix's consent to search the truck was voluntarily given.

In finding that Mr. Fix gave valid consent to Deputy Valdez to search for Mr. Bailey's driver's license, the court finds that there is no lawful basis to exclude the firearm or the other evidence eventually found in the vehicle.  The plain view doctrine

> allows a police officer to properly seize evidence of a crime without a warrant if: "(1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent—i.e., the officer had probable cause to believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself."

*United States v. Sparks*, 291 F.3d 683, 690 (10th Cir. 2002) (quoting *United States v. Carey*, 172 F.3d 1268, 1272 (10th Cir. 1999)).  Because Deputy Valdez had received permission from Mr. Fix to look around the passenger seat for Mr. Bailey's

13

identification, Deputy Valdez was lawfully in position to view the derringer when it fell from the soda box.  In addition, it was readily apparent to Deputy Valdez that the derringer was contraband due to Mr. Fix's status as a convicted felon.  Finally, Deputy Valdez also had a lawful right to access the weapon itself.  He had received permission to search the interior of the vehicle, and he observed the derringer "inadvertently, which is to say, he [did] not know in advance the location of certain evidence and intend to seize it, relying on the plain-view doctrine only as a pretext." *United States v. Jimenez*, 864 F.2d 686, 689 (10th Cir. 1988) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 468 (1971)).  Therefore, the plain view doctrine allows for the admission of the derringer and from the discovery of the derringer and Mr. Bailey's statements, the police officers had probable cause to continue to search the truck for additional contraband.  As a result, there is no legal basis to exclude the firearm or the other evidence found in the truck.

IT IS THEREFORE ORDERED BY THE COURT THAT Mr. Fix's motion to suppress (Doc. 14) is denied.

IT IS SO ORDERED.

Dated this 28th  day of January 2009, in Kansas City, Kansas.

s/ John W. Lungstrum

14

John W. Lungstrum
United States District Judge